634 A.2d 622

Christine MYSZKOWSKI, Appellant,

v.

PENN STROUD HOTEL, INC., t/a Best Western Pocono Inn, Lee Andrews, Harriet Andrews, Stroud Tavern, Good Time Saloon, John Kenneth Spahr, Kerchner Associates, Inc., Best Western International, Inc.

Superior Court of Pennsylvania.

Argued Feb. 10, 1993.

Filed Nov. 30, 1993.

316

Richard D. Gorski, Bethlehem, for appellant.

Thomas J. Carroll, Philadelphia, for Penn Stroud Hotel, Inc., appellee.

Karl R. Hildabrand, Harrisburg, for Best Western, appellee.

Before CAVANAUGH, WIEAND and CIRILLO, JJ.

CAVANAUGH, Judge:

This is an appeal from an order of the Court of Common Pleas of Monroe County which granted summary judgment in favor of appellee Best Western International, Inc. ("Best Western"). Appellant Christine Myszkowski filed suit against, *inter alia,* appellee Penn Stroud Hotel, Inc. ("Penn Stroud") t/a Best Western Pocono Inn and Best Western after she was sexually assaulted in the ladies' room of the Best Western Pocono Inn on the theory that the Inn had failed to provide adequate security. The main issues raised in this appeal involve two questions of agency: (1) whether Best Western had an actual agency relationship with Penn Stroud; and (2) whether Best Western had an apparent agency relationship with Penn Stroud. Having found that summary judgment was appropriately granted by the trial court, we affirm.

Appellant, and her two partners, were hired by a campus ministry group to work as disc jockeys at a social function the group was sponsoring on the night of April 24, 1987. The group contracted with the Best Western Pocono Inn in Stroudsburg, Monroe County to use its ballroom for this event. Appellant and her associates, as they had been hired to do, showed up at the Inn on the designated night, set up and began work. At about 1:30 AM, appellant left the ball-

room to use the ladies' restroom. While there, she was attacked and sexually assaulted by John Kenneth Spahr.[1] Appellant then initiated the present suit against, *inter alia,* Best Western and Penn Stroud alleging that Best Western either exercised or retained the right to control all of Penn Stroud's operations, that they were negligent in failing to ensure that there was adequate security and that as a direct and proximate result, appellant was attacked and suffered physical and mental injuries.

Best Western is a non-profit corporation organized under the laws of Arizona and registered to do business in the Commonwealth of Pennsylvania. Penn Stroud, by virtue of a marketing agreement with Best Western, is a member of the Best Western organization which allows it to use the "Best Western" name and participate in the Best Western reservation network. Following the commencement of this suit, Best Western moved for summary judgment on the grounds that, as a matter of law, an agency relationship did not exist between itself and Penn Stroud. The trial court agreed with Best Western and entered summary judgment in their favor. This appeal followed.

Before we can address the agency issues, we must first dispose of a preliminary issue raised by appellant. It is her contention that she was severely prejudiced when the trial court entered summary judgment without giving her the opportunity to either file a brief or argue in opposition to Best Western's motion. We have held, that when ruling on a motion, it is within the discretion of the trial court to decide whether briefs and/or oral argument are required or whether the matter can best be disposed of from a review of the record alone. *Gerace v. Holmes Protection of Phila.,* 357 Pa.Super. 467, 475, 516 A.2d 354, 359 (1986). Here, there was an extensive record before the trial court and it was aware of the legal positions of the parties as they were afforded the opportunity to argue this motion at a pretrial conference. Having reviewed the record and considered the arguments made by

1. Spahr was sentenced to a term of imprisonment following his conviction on charges stemming from this attack.

the parties to this court, we fail to see how appellant was prejudiced in this case and find no abuse of discretion on the part of the trial court.[2]

The two remaining issues raised by appellant require us to determine whether the trial court erred in ruling that, as a matter of law, neither an actual nor apparent agency relationship existed between Best Western and Penn Stroud so as to implicate Best Western of vicarious responsibility. When reviewing the grant of summary judgment, we review application of the following standard:

> A motion for summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and

2. Appellant also contends that only part of the record certified to this court was before the trial court when it ruled on Best Western's summary judgment motion because she was not given the opportunity to submit to the trial court, the admissions, depositions and an affidavit upon which she based her argument in opposition to this motion. Appellant, however, does not specifically point out what documents in the certified record were allegedly not before the trial court and our review of the original record indicates that all of the documents, depositions, interrogatories and admissions contained therein were, in fact, filed with the lower court long before summary judgment was entered.

Appellant has made this argument in the most general terms, but from what we have been able to glean from her brief, the original record and the reproduced record, it appears that what has occurred is that appellant has included in the reproduced record documents which were never before the trial court and were never docketed below and made a part of the original record. At page 24 of appellant's brief, reference is made to page 249a of the reproduced record which is an affidavit sworn out by appellant. Our review indicates that this affidavit is not part of the original record. See Pa.R.A.P., Rule 1921, 42 Pa.C.S.A. (only those documents filed in the lower court are properly a part of the record on appeal). We also note that the affidavit was not attached to appellant's motion to reconsider the entry of summary judgment. Furthermore, while appellant maintains that her argument in opposition to summary judgment relied heavily on this affidavit, it is clear that it was not attested to until November 2, 1992, which was nearly five months after summary judgment was entered. As such, appellant's argument is without merit and we will only review those materials contained in the original record in our disposition of the issues raised by appellant. See note 10, infra, for further reference to this affidavit.

that the moving party is entitled to judgment as a matter of law. In passing on a motion for summary judgment, the court must examine the record in the light most favorable to the non-moving party. [However], it is clear that to survive a motion for summary judgment, the non-moving party may not rely merely upon the allegations of the contested pleadings, but must set forth specific facts by way of affidavit, or in some other way as provided by the rule, demonstrating that a genuine issue exists.

*Kerns v. Methodist Hospital*, 393 Pa.Super. 533, 536, 574 A.2d 1068, 1069 (1990) (citations omitted). "[T]he grant of summary judgment will only be reversed for an error of law or a clear abuse of discretion." *Carns v. Yingling*, 406 Pa.Super. 279, 282, 594 A.2d 337, 339 (1991) (citation omitted).

We now focus on appellant's second issue; whether the trial court erred in ruling that, as a matter of law, an actual agency relationship did not exist between Best Western and Penn Stroud. Appellant argues that an agency relationship existed because Best Western had the right to substantially control Penn Stroud pursuant to their marketing agreement. She maintains that Best Western concerns itself with the total operation of Penn Stroud through the workshops and programs it conducts, the rules and regulations it imposes and its ability to sanction for noncompliance with its quality standards.

We begin our analysis by recognizing that, "not every relationship of principal and agent creates vicarious responsibility in the principal for acts of the agent." *Gajkowski v. Intern. Broth. of Teamsters, Etc.*, 350 Pa.Super. 285, 301, 504 A.2d 840, 848 (1986), *aff'd on rehearing*, 519 Pa. 320, 548 A.2d 533 (1988). "A principal and agent can be in the relationship of a master and servant, or simply in the status of two independent contractors." *Juarbe v. City of Philadelphia*, 288 Pa.Super. 330, 335, 431 A.2d 1073, 1076 (1981) (citations omitted). "If a particular agent is not a servant, the principal is not considered a master who may be held vicariously liable for the negligent acts of the agent." *Id.* Thus, in order for Best Western to be held vicariously liable for the alleged

negligence of Penn Stroud, the relationship between them must have been that of master and servant.[3]

In determining whether the Best Western–Penn Stroud relationship was one of master and servant or simply that of two independent contractors, we are given guidance by our Supreme Court, which has declared:

the basic inquiry is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged. . . . The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.

*Green v. Independent Oil Co.*, 414 Pa. 477, 483–4, 201 A.2d 207, 210 (1964) (citations omitted).

Appellant is correct insofar as she contends that the hallmark of a master-servant relationship is that the master possesses the right to control the *manner* in which the servant's work shall be accomplished. However, she urges us to apply what we believe is an overly-broad conception of what constitutes "control." Best Western does not "direct the manner in which the work is to be accomplished" simply by having a marketing agreement with Penn Stroud. "It is the element of *continuous subjection* to the will of the principal

3. While Pennsylvania courts have drawn an important distinction between the relationships of principal and agent and master and servant, some jurisdictions do not recognize this differentiation and use these terms interchangeably. Several cases from other jurisdictions, cited *infra*, which we have made reference to in our disposition of appellant's actual agency issue, use the terms principal-agent and master-servant interchangeably. We note that for the purposes of our analysis, these other courts' use of the more generic terms principal and agent, implicate the more specific legal concept of master and servant as they are defined in Pennsylvania. Additionally, we point out that "actual agency" refers specifically to a master-servant relationship and not the more general principal-agent relationship.

which distinguishes the ... agency agreement from other agreements." Restatement (Second) of Agency, § 1(1), comment b (1957) (emphasis added). While we are unaware of any Pennsylvania case which defines, as other jurisdictions have, the inquiry for actual agency in this context, we believe that the focus of our inquiry should be whether the alleged master has day-to-day control over the manner of the alleged servant's performance. *Little v. Howard Johnson Co.*, 183 Mich.App. 675, 679, 455 N.W.2d 390, 393 (1990) (franchisor must have right to control day to day operations of a franchise in order to establish an agency relationship); *Schweich v. Ziegler, Inc.*, 463 N.W.2d 722, 730 (Minn.1990); *Carlton v. Alabama Dairy Queen, Inc.*, 529 So.2d 921, 924–5 (Ala.1988); *Hunter Min. Laboratories, Inc. v. Management Assistance, Inc.*, 104 Nev. 568, 570, 763 P.2d 350, 352 (1988); *Hayman v. Ramada Inn, Inc.*, 86 N.C.App. 274, 277, 357 S.E.2d 394, 397 (1987); *McMullan v. Georgia Girl Fashions, Inc.*, 180 Ga.App. 228, 348 S.E.2d 748, 750 (1986); *Herman v. Bonanza*, 223 Neb. 474, 479–81, 390 N.W.2d 536, 541–2 (1986); *Schear v. Motel Management Corp. of America*, 61 Md.App. 670, 487 A.2d 1240, 1248–9 (1985); *Ortega v. General Motors Corp.*, 392 So.2d 40, 42–3 (Fla.Dist.Ct.App.1981); *Coty v. U.S. Slicing Machine Co., Inc.*, 58 Ill.App.3d 237, 241, 15 Ill.Dec. 687, 691, 373 N.E.2d 1371, 1375 (1978); *Murphy v. Holiday Inn, Inc.*, 216 Va. 490, 495, 219 S.E.2d 874, 878 (1975).

We find additional support for the proposition that the inquiry for actual agency focuses on the day-to-day control of the purported servant's conduct from the reasoning of the seminal case in Pennsylvania on this issue, *Green v. Independent Oil Co., supra.* In *Green*, our Supreme Court ruled that a lower court erred in submitting to a jury the relationship between Independent Oil Co. and one of its franchisee/dealers. Significant to its decision was: (1) the agreement between the parties specifically disclaimed the existence of an agency relationship; (2) all profits went to the dealer; (3) the sales tax permits and the electric bills were in the dealer's name; (4) the dealer hired and fired his own employees and paid them; (5) all monies were kept in the dealer's personal bank

account; and (6) the dealer purchased Independent Oil Co.'s products. *Green, supra,* at 482–3, 201 A.2d at 210.[4]  Thus, it is our judgment that the seminal case in this area focused its inquiry on the extent to which the purported master controlled the day-to-day operations of the alleged servant.  *See also, Strain v. Ferroni,* 405 Pa.Super. 349, 360–1, 592 A.2d 698, 705 (1991) (no agency relationships between physician and covering doctor where covering doctor free to use his own discretion, skill and knowledge in care of patient).

■  Here, the owners of Penn Stroud managed the day-to-day operations of the business and made all of the decisions incidental to this operation.  The employees of the Inn were hired, fired, paid, and supervised by Penn Stroud managers. Penn Stroud managers set the prices for the various services and accommodations they provide.  Best Western has no ownership interest in Penn Stroud.  To the contrary, one hundred percent of the stock in Penn Stroud is owned by defendant Lee Andrews and the Inn is run by various members of the Andrews family in Stroudsburg; Best Western is only paid a fixed amount each year ($23,500) for its services. Moreover, the agreement between Best Western and Penn Stroud specifically provides that their relationship is one of independent contractor, and that Best Western has, *inter alia,* "no responsibility for the . . . safety of the premises."  It also affords Penn Stroud the right to voluntarily end its association with Best Western at any time for any reason.  For these reasons, there is clearly not the necessary control by Best Western of day-to-day operations to establish a master-servant relationship.  *See Green, supra.*

Appellant points to incidental duties of the Best Western–Penn Stroud marketing agreement to state that a master-servant relationship may exist between the parties.  Specifically, she contends that the Best Western program of quality

4.  We also note, that similar to the present agreement, there was a contract provision which stated that Independent Oil Co. could terminate the relationship if the dealer failed to uphold his part of the agreement.  *Id.,* 414 Pa. at 485, 201 A.2d at 211.  The court did not find this fact dispositive of a master-servant relationship.  *Id.*

control, its corresponding rules and regulations and the programs and workshops Best Western conducts in order to achieve this goal are tantamount to control or the right to control. However, the fact that Best Western sets certain standards in order to maintain a uniform quality of inn service only addresses the *result* of the work and not the *manner* in which it is conducted. Here, it is Penn Stroud which decides the manner in which it will meet the quality criteria set by Best Western. Such an arrangement does not constitute a master-servant relationship, but rather is indicative of an independent contractor-contractee relationship as outlined in *Green, supra.*

Appellant also stresses the fact that if Penn Stroud failed to adhere to these quality control requirements which were checked in biannual inspections, Best Western could terminate the Inn from using its trade name. Such a sanction, however, does not indicate that there is continuous subjection to the will of the alleged master so as to constitute a master-servant relationship. *See Green, supra, note 4, supra.* Rather, it merely reemphasizes that Penn Stroud, which has the ability to voluntarily terminate its relationship with Best Western at any time, is an independent entity which controls its own destiny.[5] Best Western cannot compel Penn Stroud to alter its conduct. It merely has the ability to either terminate its relationship with Penn Stroud or threaten to terminate it. We conclude that this type of marketing arrangement simply does not evidence the type of day-to-day control over the *manner* of performance which would establish a master-servant relationship.

We find particularly persuasive the decision in *Schear, supra,* where the Maryland court addressed a fact pattern similar to the present one. In *Schear,* the plaintiffs had certain valuable items stolen from their room while in the Holiday Inn at Chevy Chase, Maryland. The Hotel was not

**5.** All contracts contain respective rights and obligations. In many contracts, one party's duties often outweigh the corresponding duties of the other. Notwithstanding, the presence of these rights and duties does not necessarily create the existence of a master-servant relationship.

owned by Holiday Inn. The Holiday Inns, Incorporated, ("Holiday") granted a franchise to Chevy Chase Motel Associates ("Associates"). Associates, in turn, contracted with Motel Management Corporation of America ("Management") to operate and manage the hotel. The court found that control by Holiday was "totally lacking," noting that general oversight does not constitute "control" under the law:

> The control element was totally lacking in this case. The management and operation of the Chevy Chase Holiday Inn were vested entirely in Associates, which in turn contracted with Management, Craig's employer, to manage the running of the hotel. Although Holiday retained the right to conduct periodic inspections as a means of insuring adherence to Holiday Inn standards, it took no part in the day-to-day operation of the hotel. Associates merely purchased a product from Holiday—a uniform system of inn service— that carried with it an obligation to maintain certain standards prescribed by the seller. But "the fact that one of the parties has subsidiary duties to act for the interests of another, as where a purchaser of goods from a manufacturer agrees that he will advance the interests of the manufacturer in certain respects, does not create an agency relation with respect to the sale." Restatement (Second) of Agency § 13, comment c (1958). The right possessed by Holiday to insure compliance with its franchise standards constitutes no more than the right to enforce such a subsidiary duty.

*Schear, supra,* at 688, 487 A.2d at 1249.

A situation with almost identical facts as the case at bar was presented in *Hayman, supra.* In *Hayman,* a woman was assaulted on the premises of a Ramada Inn in Winston–Salem, North Carolina. She sued, *inter alia,* Ramada Inn Inc., asserting that it was vicariously liable for the alleged negligence of its franchise. In affirming the grant of summary judgment, the court declared:

> Having carefully reviewed the Licensee Agreement between defendant and [the Inn's owner], we find no evidence that defendant retained or exercised the kind of detailed control over the daily operation of the Akron Drive Ramada Inn

that would establish a principal-agent relationship. The general purpose of the contract is the maintenance of uniform service within, and public good toward, the Ramada Inn system. Otherwise, [the Inn's owner] operates the facility on its own behalf. The agreement primarily requires [the Inn's owner] to comply with certain standards in the construction, furnishing, and advertising of the facility. Apart from the imposition upon [the Inn's owner] to maintain its accommodations "in a clean, attractive, safe and orderly manner," the twenty-page contract imposes no standards nor makes any other provision with respect to security of the premises. Under the agreement, defendant neither retained authority over, nor established standards for, hiring, firing, supervision, or discipline of personnel or myriad other details of the day-to-day operation. Moreover, although defendant has retained the right to conduct regular inspections of the accommodations to insure compliance with the contract and rules of operation, defendant's actual control is limited to a right to terminate the franchise agreement and collect damages for any noncompliance [by the Inn's owner]. Under these circumstances, we conclude that no actual agency relationship existed that would justify holding defendant responsible for [the Inn's owner's] security arrangement.

*Hayman, supra,* at 277, 357 S.E.2d at 397.

Similarly, for the reasons articulated *supra,* Best Western did no more than enter into a marketing agreement with Penn Stroud. The nature of this marketing agreement is that Best Western, in exchange for a fixed payment each year ($23,500) and adherence to certain rules concerning the quality of the accommodations, provides Penn Stroud with the right to use its trade name. This is not a master-servant relationship. It is clear from the record that Penn Stroud owned and operated the Inn and had full, day-to-day control, while the most significant "control" Best Western possessed was a threat to take away the use of its trade name. As such, Best Western did not have the necessary control over Penn Stroud to establish the existence of a master-servant relationship; consequently, Best Western cannot be held vicariously liable for

the alleged negligence of Penn Stroud under an actual agency theory.[6]

The final issue raised for our consideration is whether the trial court erred in ruling that, as a matter of law, an apparent agency relationship did not exist between Best Western and Penn Stroud. Appellant contends that Best Western held itself out as the owner/operator of Penn Stroud, that she relied on this representation and therefore, Best Western could be held vicariously liable for the negligent acts and/or omissions of Penn Stroud.

Both appellant and Best Western refer our attention to the Restatement (Second) of Agency, § 267 (1975), which outlines the rule of apparent or ostensible agency.[7] Appellant also

6. Appellant relies principally on two federal cases which purport to attempt to predict Pennsylvania law in this area, *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 (3rd Cir.1978) and *Drummond v. Hilton Hotel Corp.*, 501 F.Supp. 29 (E.D.Pa.1980). The former case does not speak to our fact scenario, having had to deal with a franchise agreement which was so broadly drawn that it gave the franchisor such broad discretionary power *as to be able to impose on the franchisee* virtually any measure it deemed warranted. *Drexel, supra*, 582 F.2d at 789. Accordingly, we do not find it analogous to the case *sub judice*, as the respective rights and duties in the contract at issue herein, clearly indicate that Best Western does not control Penn Stroud's business conduct.

In the latter case, the *Drummond* court denied the franchisor's motion for summary judgment based on the following facts: (1) the franchisee was required to use the franchisor's name in all advertising and promotion; (2) the right of the franchisor to consult with the franchisee hotel on operating problems; (3) the right of the franchisor to inspect the franchisee hotel to maintain its standards of quality; and (4) the fact that an express denial of an agency relationship is not of itself determinative of the existence of such a relationship. *Drummond, supra*, at 31. We believe this analysis to be erroneous. Without more, these factors do not indicate that the franchisor had the right to control the day-to-day operations of the franchisee. At most, these factors only speak to the franchisor's desired *result*, which is the maintenance of a uniform level of quality in its franchisees. None of the factors cited by the *Drummond* court directly concerns the *manner* in which the franchisee must meet this *result*. Thus, the presence of these factors alone, does not give rise to a genuine issue of material fact with respect to the right to control the day-to-day operations of the franchisee. Because we believe the reasoning of *Drummond* is flawed, we do not find it persuasive in our resolution of appellant's actual agency issue.

7. § 267 of the Restatement (Second) of Agency states:

offers, in support of her position, caselaw which relies on the doctrine of apparent authority. Our review of the relevant caselaw, however, leads us to conclude that while Pennsylvania recognizes the closely related agency doctrines of apparent authority and agency by estoppel, our Commonwealth has not formally adopted § 267 of the Restatement.[8] In *Juarbe, supra,* we stated that a principal may be liable to another for the acts of an agent on the grounds of apparent authority or agency by estoppel. *Id.* 288 Pa.Super. at 342, 431 A.2d at 1079. We explained these two agency theories as follows:

> Agency by estoppel is defined by section 8B. of the Restatement (Second) of Agency and the doctrine has been embraced by this court. . . . [We have] emphasized two basic elements of agency by estoppel: (1) there must be negligence on the part of the principal in failing to correct the belief of the third party concerning the agent; and (2) there must be justifiable reliance by the third party. . . . *Agency by estoppel is generally deemed to be closely related to apparent authority. Thus, alternatively stated, a principal who clothes his agent with apparent authority is estopped to deny such authority.*

*Juarbe, supra, quoting Turnway Corporation v. Soffer,* 461 Pa. 447, 457, 336 A.2d 871, 876 (1975) (citations omitted) (emphasis added).

In the present case, the doctrine of apparent authority is simply not applicable. Both apparent authority and agency by estoppel are "customarily [only] relevant in the context of business transactions." *Juarbe, supra.*[9] Here, the

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

8. We note, however, that apparent or ostensible agency, as embodied in § 267, is substantially similar to the doctrines of apparent authority and agency by estoppel. *Capan v. Divine Providence Hospital,* 287 Pa.Super. 364, 369 n. 4, 430 A.2d 647, 649 n. 4 (1980).

9. In *Juarbe,* plaintiff/appellant brought a negligence action against Exxon Company and an Exxon service station after she had slipped and

claim is one in tort for the alleged negligence which resulted in the sexual assault of appellant. Under the facts of this case, we fail to see how appellant can be said to have *relied* upon the apparent authority of Penn Stroud to avoid being the victim of this random act of violence. Our review of the record indicates that appellant has presented no evidence which even remotely supports her allegation that she *relied* upon the fact that Penn Stroud represented Best Western, as its agent, on the night she was sexually assaulted. As explained *supra*, appellant was hired by a third party, a campus ministry group, wholly unrelated to either Best Western or Penn Stroud, to work as a disc jockey on the night of April 24, 1987 at the Best Western Pocono Inn. Appellant neither contracted nor negotiated with Best Western or Penn Stroud; the ministry group specified to appellant where the function was to take place. She simply agreed to show up at the designated place, on the designated night and play music for a social function sponsored by the ministry group. Our review of the record not only indicates that she did not *rely* on the fact that the designated place carried the name "Best Western," but that it appears she would have performed the service she had contracted to at most any location the campus ministry group had designated. Thus, Best Western cannot be held vicariously liable for the alleged negligence of Penn Stroud under the theory of apparent authority.[10]

fallen on an accumulation of petroleum products present on the sidewalk of the service station, claiming that as a result of this fall she gave premature birth to her child, who subsequently died as a result of causes associated with this premature birth. With regard to Exxon Company's liability under the doctrines of apparent authority and agency by estoppel, we affirmed the trial court's entry of summary judgment on this issue, reasoning that these doctrines are customarily relevant in the context of business transactions and had no application under the facts presented. *Juarbe, supra. See Gajkowski, supra*, 350 Pa.Super. at 304, 504 A.2d at 850 (doctrine of apparent authority customarily applicable in contract liability settings when there is reliance on the agent's authority).

10. As noted *supra*, appellant has submitted an affidavit to this court which is not a part of the original record. Although we have held that we will not consider it in disposing of the issues appellant has raised, we believe it warrants one further comment. The affidavit reads, in pertinent part:

We conclude, therefore, that as a matter of law, a master-servant relation did not exist between Best Western and Penn Stroud nor was Penn Stroud clothed with apparent authority under the facts of this case so as to render Best Western vicariously liable for Penn Stroud's alleged negligence. Accordingly, we affirm the order of the trial court granting summary judgment in favor of Best Western.

Order affirmed. Jurisdiction relinquished.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting:

Although the majority has carefully reviewed the facts of this case, I am of the opinion that such facts do not unerringly lead to the conclusion that the relationship between Best Western International, Inc. and Penn Stroud Hotel, Inc. was that of owner and independent contractor. On the contrary, there is present here an issue of fact for a jury to determine. That issue is whether Best Western International, Inc. reserved a sufficient right of control over the manner in which Penn Stroud Hotel, Inc. operated the Best Western Pocono Inn to give rise to a master and servant relationship and render Best Western International, Inc. vicariously liable for the negligence, if any, of Penn Stroud Hotel, Inc. in the operation of the Best Western Pocono Inn. Therefore, I respectfully dissent from the majority's decision to affirm the trial court's entry of summary judgment in favor of Best Western International, Inc.

> At all times I was under the belief that I was to be working at a hotel owned and operated by Best Western, a nationwide chain of hotels.
> /s/ Christine Myszkowski
> Appellant offers this affidavit in order to show that she relied on the fact that the hotel carried the name Best Western. However, all that her statement indicates is that she was aware that the place she would be working was a Best Western. It does not, in any way or to any degree, indicate that she relied on the Best Western name in choosing to work there so as to create a genuine issue of material fact which would defeat the motion for summary judgment. Thus, even if we were to consider appellant's affidavit in our disposition of her claim of apparent agency, it would not affect our resolution of this issue.

Christine Myszkowski was sexually assaulted while using the ladies' restroom at the Best Western Pocono Inn, in Stroudsburg, Monroe County. She filed suit against Penn Stroud Hotel, Inc., which owned the inn, and also against Best Western International, Inc., on grounds that inadequate security had been provided. The trial court entered summary judgment in favor of Best Western, and Myszkowski appealed.

On April 25, 1987, Myszkowski was working as a disc jockey at a social function being conducted at the inn by a local college ministry group. The campus organization had leased a banquet room at the inn and had independently hired Myszkowski and her partner to provide music and entertainment. During the course of the evening, Myszkowski had occasion to use the ladies' restroom, where she was surprised and assaulted by John Kenneth Spahr.[1]

In 1980 or 1981, Penn Stroud Hotel was approved as a member of the Best Western organization. This enabled the hotel to use the "Best Western" name for advertising and promotional purposes and to participate in the Best Western reservation network. Best Western, a non-profit corporation organized under the laws of Arizona and registered to do business in the Commonwealth of Pennsylvania, contends that it does not control the operation of Penn Stroud's hotel business. It describes itself as a "marketing organization which benefits its member properties through the use of a cooperative reservation system, joint advertising, volume discounts, quality assurance standards, and other income generating services." It denies that there is a franchisor-franchisee relationship.

In her complaint, Myszkowski alleged that Best Western had been negligent for failing to require better security and was vicariously liable for Penn Stroud's failure to provide adequate security. Best Western denied these claims and moved for the entry of summary judgment.

1. Spahr was subsequently convicted criminally for his conduct and was sentenced to serve a term of imprisonment in a state correctional institution.

A motion for summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In passing upon a motion for summary judgment, a court must examine the record in a light most favorable to the nonmoving party and resolve all doubts against the moving party. *Mariscotti v. Tinari,* 335 Pa.Super. 599, 601, 485 A.2d 56, 57 (1984); *Thorsen v. Iron and Glass Bank,* 328 Pa.Super. 135, 140–141, 476 A.2d 928, 930–931 (1984). "It is not the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried." *Id.* at 141, 476 A.2d at 931.

Although an employer may be liable for negligent acts of his or her servants or employees, there is no vicarious liability for harm caused by independent contractors. *Lutz v. Cybularz,* 414 Pa.Super. 579, 583, 607 A.2d 1089, 1091 (1992). See: *Hader v. Coplay Cement Manufacturing Co.,* 410 Pa. 139, 189 A.2d 271 (1963).

'The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.'

*George v. Nemeth,* 426 Pa. 551, 553–554, 233 A.2d 231, 232 (1967), quoting *Green v. Independent Oil Co.,* 414 Pa. 477, 484, 201 A.2d 207, 210 (1964). See also: *Moon Area School District v. Garzony,* 522 Pa. 178, 560 A.2d 1361 (1989). Broadly stated, if the agent is under the control of the employer, he is a servant; if he is not under such control, he is an independent contractor. *Feller v. New Amsterdam Casualty Co.,* 363 Pa. 483, 486, 70 A.2d 299, 300 (1950). The actual control exercised by an employer over the manner of work, however, is not determinative of the relationship; rather, it is the employer's right or authority to control which renders one an employee or servant and not an independent contractor. See: *Lutz v. Cybularz, supra* 414 Pa.Super. at 583, 607 A.2d

at 1091. "It is the exclusive function of the jury to determine, from the evidence, the precise nature of the relationship, except where the facts are not in dispute, in which latter event the question becomes one for determination by the court." *Melmed v. Motts*, 341 Pa.Super. 427, 430–431, 491 A.2d 892, 893 (1985) (citations omitted).

In *Drexel v. Union Prescription Centers, Inc.*, 428 F.Supp. 663 (E.D.Pa.1977), decedent's wife brought a claim against Union Prescription Centers, Inc. (UPC) to recover for the injuries and resulting death of her decedent, all of which had occurred as a result of an improperly filled prescription. UPC moved for summary judgment, averring that it owed no duty to the plaintiff because the drugstore was an independent contractor and UPC was not the "owner, operator, possessor or in control" of the drugstore at the time of the alleged negligence. The district court granted the motion and entered summary judgment in favor of UPC. On appeal, the Third Circuit Court of Appeals reversed. It held that it could not be determined as a matter of law that UPC did not have the right to control the operations of the drugstore. See: *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 (3d Cir.1978). In reaching this conclusion, the court observed that although the parties' franchise agreement denied the existence of an agency relationship, this was not in itself determinative of the relationship. *Id.* at 786. Accord: *George v. Nemeth, supra* 426 Pa. at 554, 233 A.2d at 233. Moreover, although there was no evidence that UPC had exercised actual control over the manner in which the drugstore operated, the parties' agreement contained many provisions according UPC the right to do so. The agreement required that the franchisee operate under the name of UPC, grant UPC the right of inspection, remain open for business a minimum number of hours per week, maintain the exterior and interior of the premises in UPC's standard colors, purchase and maintain specific types of insurance policies and name UPC as an insured, utilize insignia, equipment, decals, uniforms and colors required by UPC, and operate "as part of a national organization securing its strength through adherence to

UPC's uniformly high standards of service, appearance, quality of equipment and proved methods of operation." UPC had the right to terminate the relationship if the franchisee breached any provision of the parties' agreement. Because "reasonable minds could differ as to whether or not UPC had the right to control [the franchisee's] physical conduct and the manner in which he operated the store," the Court held that a genuine issue of fact remained to be decided. *Drexel v. Union Prescription Centers, Inc., supra,* 582 F.2d at 789.

Similarly, in *Drummond v. Hilton Hotel Corp.,* 501 F.Supp. 29 (E.D.Pa.1980), Verna Drummond brought an action against the Hilton Hotel Corporation (Hilton) to recover damages for injuries which she had sustained in a fall in a Hilton Inn (Inn). Hilton moved for summary judgment, averring that it did not own, maintain, control or operate the Inn and that an agreement between Hilton and the Inn specifically disavowed any agency relationship. The agreement did provide, however, that Hilton had the right to consult with the owners of the Inn and the right to inspect the hotel to maintain the standards of the Hilton system. The agreement also required that the Hilton name be used in all advertising and promotional material. Relying on *Drexel, supra,* the court denied the motion for summary judgment, reserving the issue of Hilton's right to control the hotel's operations for determination by a jury. *Id.* 501 F.Supp. at 31. See also: *Clem v. Steveco, Inc.,* 450 N.E.2d 550 (Ind.App.1983); *Chargois v. Trip–L–Quik,* 441 So.2d 45 (La.App.1983); *Billops v. Magness Construction Co.,* 391 A.2d 196 (Del.1978); *Singleton v. International Dairy Queen, Inc.,* 332 A.2d 160 (Del.Super.Ct.1975). But see contra: *Ortega v. General Motors Corp.,* 392 So.2d 40 (Fla.App. 1980); *Murphy v. Holiday Inns, Inc.,* 216 Va. 490, 219 S.E.2d 874 (1975).

In the instant case, the owners of the Pocono Inn managed the day-to-day business of the inn and made the decisions incidental thereto. They recruited and paid hotel personnel, maintained the property, and provided for security, accounting and supervisory services. The hotel's agreement with Best Western disavowed any agency relationship and provided that

the Penn Stroud Hotel should be an independent contractor. It provided, specifically, as follows:

Applicant [Penn Stroud Hotel] acknowledges that the relationship of Best Western to its members is one of independent contractor, that neither party to this Agreement has the power to obligate or bind the other in any way, and that no relationship of partners, joint venturers or agents is created by this Application and Agreement. It is understood that Best Western has no responsibility for the use, condition or operation of the subject property, no control of or responsibility for the safety of the premises or the safety of the design of any structure or product, and that Best Western has no control over or responsibility for any decision affecting the employment or supervision of any person employed in connection with the subject property.

On the other hand, all members of the Best Western organization were subject to a quality control biannual inspection, as a result of which the members were scored according to the conditions of their properties and the amenities provided. The failure to obtain a minimum score, pre-determined by Best Western, could result in sanctions ranging from probation to termination of membership. Even where sanctions were not imposed, members were obligated to correct, replace, repair or renovate those areas where repairs or renovations were deemed necessary by Best Western. Rules and regulations applicable to members required that they incorporate the Best Western name and logo into all property signage and that the telephone be answered by using the words, "Best Western." Other regulations pertained to the keeping of the grounds, the attire of and utensils used by maids, and the furnishing of rooms. From all of this it would appear that Best Western may well have reserved some right of control over the manner in which the Pocono Inn was operated by its owners.

Under the circumstances of this case, therefore, it cannot be determined as a matter of law that a master-servant relationship did not exist between the parties. Whether Best Western reserved a right to control the manner in which the

Pocono Inn was operated by Penn Stroud Hotel, Inc., so as to render Best Western vicariously liable for the inn's negligence, if any, is a question which must be decided by a jury.

I would reverse and remand for further proceedings.